**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

━━━━━━━━━━━━━━━━━━━━━━━━━━

DEBRA LANETTE P.,

                                        Plaintiff,

          v.

COMMISSIONER OF SOCIAL SECURITY,                    No. 5:20-CV-1634
                                                    (CFH)

                                        Defendant.

━━━━━━━━━━━━━━━━━━━━━━━━━━

**APPEARANCES:**                        **OF COUNSEL:**

Law Offices of Kenneth Hiller, PLLC     JUSTIN M. GOLDSTEIN, ESQ.
600 North Bailey Avenue – Suite 1A      KENNETH R. HILLER, ESQ.
Amherst, New York 14226
Attorneys for plaintiff

Social Security Administration          DANIEL STICE TARABELLI, ESQ.
J.F.K. Federal Building,
15 New Sudbury Street, Suite 625
Boston, Massachusetts 02203
Attorney for defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**MEMORANDUM-DECISION AND ORDER**[1]

          Debra Lanette P.[2] ("plaintiff") brings this action pursuant to 42 U.S.C. § 405(g)

seeking review of a decision by the Commissioner of Social Security ("the

Commissioner") denying her applications for social security income and disability

───────────────────

[1] Parties consented to direct review of this matter by a Magistrate Judge pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 72.2(b), and General Order 18.  See Dkt. No. 5.
[2] In accordance with guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in 2018 to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify plaintiff's last name by initial only.

insurance benefits.  <u>See</u> Dkt. No. 1 ("Compl.").  Plaintiff moves for reversal and remand for the determination of benefits.  <u>See</u> Dkt. No. 13.  The Commissioner cross moves for judgment on the pleadings.  <u>See</u> Dkt. No. 14.  For the following reasons, plaintiff's motion for judgment on the pleadings is granted, the Commissioner's cross-motion for judgment on the pleadings is denied, and the determination of the Commissioner is reversed and remanded for further proceedings.

## I. Background

On April 8, 2019, plaintiff filed Title II and Title XVI applications for disability insurance and social security income benefits.  <u>See</u> T. at 212-23.[3]  Plaintiff initially alleged a disability onset date of June 1, 2016, which was later amended to February 8, 2019.  <u>See</u> <u>id.</u> at 38.  The Social Security Administration ("SSA") denied plaintiff's claims on July 24, 2019.  <u>See</u> <u>id.</u> at 133-42.  Plaintiff sought reconsideration and her claims were again denied on November 18, 2019.  <u>See</u> <u>id.</u> at 143, 153.  Plaintiff requested a hearing, <u>see</u> <u>id.</u> at 162, and a hearing was held on April 17, 2020, before Administrative Law Judge ("ALJ") Robyn L. Hoffman.  <u>See</u> <u>id.</u> at 33-59.  On August 5, 2020, the ALJ issued an unfavorable decision.  <u>See</u> <u>id.</u> at 13-24.  On December 2, 2020, the Appeals Council denied plaintiff's request for review.  <u>See</u> <u>id.</u> at 1-5.  Plaintiff timely commenced this action on December 31, 2020.  <u>See</u> Compl.

---

[3] "T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner. <u>See</u> Dkt. No. 12.  Citations to the administrative transcript refer to the pagination in the bottom, right-hand corner of the page, not the pagination generated by CM/ECF.

## II. Legal Standards

### A. Standard of Review

In reviewing a final decision of the Commissioner, a district court may not determine de novo whether an individual is disabled.  See 42 U.S.C. §§ 405(g), 1388(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied or it was not supported by substantial evidence.  See Johnson v. Bowen, 817 F.2d 983, 985-86 (2d Cir. 1987); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).  The substantial evidence standard is "a very deferential standard of review . . . . [This] means once an ALJ finds facts, we can reject [them] only if a reasonable factfinder would have to conclude otherwise."  Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (internal quotations marks, citation, and emphasis omitted).  Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, the decision should not be affirmed even though the ultimate conclusion is arguably supported by substantial evidence. See Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing Johnson, 817 F.2d at 986).  However, if the correct legal standards were applied and the ALJ's finding is supported by substantial evidence, such finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's

independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted).

### B. Determination of Disability

"Every individual who is under a disability shall be entitled to a disability . . . benefit . . . ." 42 U.S.C. § 423(a)(1)(E).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" Id. § 423(d)(1)(A).  A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience. See id. § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3).  Additionally, the severity of the impairment is "based on objective medical facts, diagnoses[,] or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience." Ventura v. Barnhart, No. 04-CV-9018 (NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.
>
> If he [or she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which

significantly limits his [or her] physical or mental ability to do basic work activities.

If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.

Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.

Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added).  "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further."  Barnhart v. Thomas, 540 U.S. 20, 24 (2003).  The plaintiff bears the initial burden of proof to establish each of the first four steps.  See DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere.  Id. (citing Berry, 675 F.2d at 467).

### III. The ALJ's Decision

Applying the five-step disability sequential evaluation, the ALJ first determined that plaintiff had not engaged in substantial gainful activity since February 8, 2019, the

amended alleged onset date.  See T. at 16.  At step two, the ALJ found that plaintiff had

the following severe impairments: "chronic liver disease, depressive disorder,

generalized anxiety disorder, bipolar disorder, schizoaffective disorder, and substance

abuse disorder in remission[.]"  Id.  At step three, the ALJ determined that plaintiff did

not have an impairment or combination of impairments that met or medically equaled

the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix

1.  See id.  Before reaching step four, the ALJ concluded that plaintiff retained the

residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R.

§§ 404.1567(c) and 416.967(c) except she

> can lift and carry up to 50 pounds occasionally and up to 25 pounds
> frequently; stand or walk for six hours; and sit for up to six hours, all in an
> eight-hour workday with normal breaks.  Mentally, [plaintiff] should perform
> simple, routine and repetitive tasks.  She requires a low-stress job, which
> is defined as involving only occasional decision-making, occasional use of
> judgment, and occasional changes in the work setting. [Plaintiff] should
> perform goal-oriented work, rather than production-pace rate work.  She
> should have only occasional contact with co-workers and supervisors, and
> only incidental contact with the public.  Incidental is defined as more than
> never and less than occasional.  In other words, [plaintiff] should not have
> direct interaction with the public, but she need not be isolated away from
> the public.

Id. at 19.  At step four, the ALJ determined that plaintiff was unable to perform relevant

past work.  See id. at 22.  At step five, considering the plaintiff's age, education, work

experience, and RFC, the ALJ concluded that there were jobs that existed in significant

numbers in the national economy that plaintiff could perform.  See id. at 23-24.  Thus,

the ALJ determined that plaintiff had "not been under a disability, as defined in the

Social Security Act, from February 8, 2019, through the date of this decision[.]"  Id. at

24.

### IV. Arguments[4]

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because she (1) improperly rejected the opinion of plaintiff's treating therapist and (2) did not include a limitation in plaintiff's RFC for having "ready access" to bathrooms. Dkt. No. 13 at 13, 23.  The Commissioner argues that the ALJ's decision is supported by substantial evidence because the ALJ appropriately considered the entire record in discounting the opinion of plaintiff's treating therapist and in formulating plaintiff's RFC. See Dkt. No. 14 at 4-12.

### V. Discussion

### A. RFC Determination

A plaintiff's RFC is defined as "what an individual can still do despite his or her limitations. . . .  Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis[.]" Pardee v. Astrue, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (quoting Melville, 198 F.3d at 52 (citation omitted)).  "In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, [and] symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." Id. (citing 20 C.F.R. § 404.1545(a)).  "Ultimately, '[a]ny impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment.'"  Hendrickson v. Astrue, No. 5:11-CV-

---

[4] The Court's citations to the parties' briefs refer to the pagination generated by CM/ECF in the pages' headers.

927 (ESH), 2012 WL 7784156, at *3 (N.D.N.Y. Dec. 11, 2012) (quoting Titles II & XVI: Capability to Do Other Work-The Medical-Vocational Rules As A Framework for Evaluating Solely Nonexertional Impairments, Social Security Rulings ("SSR") 85-15, 1985 WL 56857, at *6 (1985)).  The RFC determination "must be set forth with sufficient specificity to enable [the Court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).

"Part and parcel to the RFC determination is the ALJ's review of the medical opinion evidence . . . ." Dumas v. Comm'r of Soc. Sec., No. 7:13-CV-1099 (GTS/TWD), 2015 WL 1403342, at *13 (N.D.N.Y. Mar. 26, 2015).  Under the relevant regulations, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on their supportability and consistency, the author's relationship with the claimant and specialization, and "other factors." 20 C.F.R. § 404.1520c(a)-(c).[5]  Although the ALJ is not required to assign a specific "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. § 404.1520c(a) and (b)(1).  The ALJ must expressly "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. Id. § 404.1520c(b)(2).  "[S]upportability" means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. § 404.1520c(c)(1).  "[C]onsistency" means that "[t]he

---

[5] 20 C.F.R. § 404.1520c contains the relevant regulations for Title II applications.  20 C.F.R. § 416.920c reflects identical rules for claimants filing under Title XVI.  Plaintiff filed an application under both Titles. See T. at 192-95.  Throughout this Memorandum-Decision & Order, the Court will reference the Title II regulations.

more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. § 404.1520c(c)(2).[6] "If the ALJ fails adequately to explain the supportability or consistency factors, or bases her explanation upon a misreading of the record, remand is required." Rivera v. Comm'r of the Soc. Sec. Admin., No. 19-CV-4630 (LJL/BCM), 2020 WL 8167136, at *14 (S.D.N.Y. Dec. 30, 2020), report and recommendation adopted, 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021) (citation and quotation marks omitted).

"[T]he ALJ's conclusion [need] not perfectly correspond with any of the opinions of medical sources cited in his decision, [and] he [or she i]s entitled to weigh all of the evidence available to make an RFC finding that [i]s consistent with the record as a whole." Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order). The Court "defer[s] to the Commissioner's resolution of conflicting evidence." Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012) (citation omitted). Therefore, even if a plaintiff disagrees with the ALJ's assessment of opinion evidence and can point to evidence in the record to support his or her position, "whether there is substantial evidence supporting the [plaintiff's] view is not the question []; rather, [the Court] must decide whether substantial evidence supports the ALJ's decision." Bonet ex rel. T.B. v. Colvin, 523 F. App'x 58, 59 (2d Cir. 2013) (summary order) (emphasis omitted). The ALJ must not "ignore evidence or cherry pick only the evidence from medical sources that support a particular conclusion and ignore the contrary evidence"

---

[6] The ALJ is not required to discuss the remaining factors unless he or she finds that two or more medical opinions are equally supported and consistent with the record. See 20 C.F.R. § 404.1520c(b)(3).

but "[t]he Court will not reweigh the evidence that was before the ALJ." <u>April B. v. Saul</u>, No. 8:18-CV-682 (DJS), 2019 WL 4736243, at *6 (N.D.N.Y. Sept. 27, 2019) (citations and internal quotation marks omitted). "An ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits [the Court] to glean the rationale of an ALJ's decision[.]'" <u>Cichocki v. Astrue</u>, 729 F.3d 172, 178, n.3 (2d Cir. 2013) (citing <u>Mongeur</u>, 722 F.2d at 1040).

### B. Plaintiff's Physical RFC

### 1. Medical Opinions Regarding Physical Limitations

### a. Consultative Examiner

Elke Lorensen, M.D., conducted plaintiff's physical consultative examination. <u>See</u> T. at 724-27.  Dr. Lorensen noted that plaintiff "complain[ed] of liver cirrhosis, pancreatic pseudocyst, and ongoing substance abuse of alcohol, crack, and cocaine." <u>Id.</u> at 724.  Plaintiff reported to Dr. Lorensen that "she has problems controlling her urine and will frequently be unable to make it to the bathroom, so she wears undergarments." <u>Id.</u>  Plaintiff informed Dr. Lorensen that she "takes care of four nieces and nephews[,]" occasionally cooks and does laundry, "denies doing any cleaning[,]" [h]er mother and her nieces do the shopping[,]" [s]he showers once a week[,]" only dresses when she needs to, watches television, and "goes out only to appointments." <u>Id.</u> at 724-25.  Dr. Lorensen indicated that plaintiff was not in acute distress, had a normal gait and stance, could perform a full squat, did not use an assistive device, did not need help changing for the exam or getting on and off the exam table, and she was able to rise from a chair without difficulty. <u>See id.</u> at 725.  Dr. Lorensen also noted that plaintiff had full flexion and ranges of motion in her musculoskeletal system, intact finger dexterity and five out

of five grip strength.  See id. at 726.  Dr. Lorensen indicated that plaintiff had "[m]inimal tenderness to palpation in the epigastric region and the right upper quadrant" but "[n]o hepatosplenomegaly or masses.  No abdominal bruits."  Accordingly, Dr. Lorensen determined that her prognosis was "[g]uarded" but there were "[n]o gross physical limitations identified on the basis of [the] exam."  Id.

### b. State Agency Medical Consultants

R. Reynolds, M.D., conducted plaintiff's initial physical disability determination. See T. at 68.  Dr. Reynolds reviewed the record and stated that plaintiff had a history of "Hep C and cirrhosis."  Further, records from Iqbal Intikhab, M.D., plaintiff's gastroenterologist, showed that she was "last seen in 2017 and was starting Zepatier, but developed headaches.  [Plaintiff] denied jaundice, pain, or change in bowels. Ultrasound in 2017 showed left lobe of liver with echogenic lesion 3cam, 1.1 echogenic lesion in right lobe which may be hemangioma, lesion was table with prior images."  Id.; see id. at 524-25.  Dr. Reynolds explained that plaintiff's "current MRI was abnormal showing liver lesion, stable in segment 2 of liver possibly atypical hemangioma, small lesion in right lobe, no need for surgery.  [Plaintiff] underwent panendoscopy which showed small hiatal hernia, otherwise testing was normal."  Id. at 68.  Dr. Reynolds noted that 2019 records from plaintiff's primary care physician Paul S. Cohen, M.D., indicated that plaintiff had a history "of ETOH[7] use"; she was actively using crack cocaine on 3-3-19"; had "joint pain with no muscle weakness, no back pain"; and a neck CT, L-spine X-ray, and left hip X-ray were normal.  Id.  Dr. Reynolds also recounted Dr.

---

[7] "ETOH is an acronym for ethyl alcohol and appears to be used here as short hand to describe alcohol use disorder."  Zukowski v. Berryhill, No. 8:16-CV-1537 (CFH), 2018 WL 1325875, at *8, n.9 (N.D.N.Y. Mar. 13, 2018) (citing Ethyl (ETOH) definition, Stedman's Medical Dictionary 675 (28th ed. 2006)).

Lorensen's consultative examination findings and plaintiff's statement to Dr. Lorensen that she has "trouble controlling her urine." Id. Dr. Reynolds concluded that plaintiff had no exertional or non-exertional limitations, i.e., "no physical limitations." Id.

D. Chen M.D., conducted plaintiff's physical disability determination on reconsideration. See T. at 101. Dr. Chen recounted Dr. Reynolds' initial disability determination, verbatim. See id. Dr. Chen additionally noted that plaintiff had follow up appointments with her primary care provider and reported "no drug use since" her release from an inpatient drug rehabilitation program. Id. Her follow up exam was "grossly normal." Id. Dr. Chen noted that plaintiff's abdominal exam indicated there was "no hernia appreciated, no organ enlargement, . . . normal gait/station." Id. Dr. Chen concluded that the "[e]vidence in file supports finding of severe [medically-determinable impairment], despite which, [plaintiff] retains capacity for work w/ limitations." Id. Dr. Chen determined that plaintiff could occasionally lift or carry fifty pounds; frequently lift or carry twenty-five pounds; stand, walk, or sit for six hours; and "require[d] ready access to bathroom facilities due to urinary incontinence." Id. at 101; 100.[8]

## 2. ALJ's Discussion of Plaintiff's Physical Limitations

In relevant part, the ALJ determined that plaintiff's chronic liver disease was a severe impairment. T. at 16. The ALJ stated that there was "evidence that [plaintiff] also has a history of hypertension, hepatitis C, surgical hernia repair, surgical bladder

---

[8] The record also contains an "Electronic Request for Medical Advice" from an SSA analyst to Dr. Chen stating that on reconsideration "[plaintiff] has some difficulty w/ urinary incontinence. At initial level – no limitations were given. I have amended the RFC and restricted the RFC and added ready access to a bathroom facility, in light of all evidence in file. . . . Please review and sign if you agree or amend as necessary." T. at 946.

repair, and rheumatoid arthritis" but that they were not severe impairments because they did not "impose[] more than minimal limitations on [plaintiff's] ability to perform basic work activities[.]"  Id.

The ALJ reviewed Dr. Lorensen's opinion and the two disability determinations and noted that both Dr. Lorensen and Dr. Reynolds concluded that plaintiff had no gross physical limitations, but Dr. Chen concluded that she "was capable of 'medium' exertion."  T. at 20.  The ALJ stated that she found "these medical opinions persuasive insofar as they are consistent with one another and supported by substantial evidence." Id.  The ALJ summarized that "[a]ll three medical sources agreed that [plaintiff] has no significant limitations for sitting, standing, walking, reaching, or performing manipulative or postural activities[]" which was "supported by Dr. Lorensen's examination[.]"  Id.  The ALJ explained that "given [plaintiff's] medical history, I am persuaded to adopt Dr. Chen's opinion and restrict [plaintiff] to 'medium' exertion."  Id.  The ALJ determined that Dr. Chen's assessment was "more persuasive than the other medical opinions because it is supported by a detailed narrative analysis of the evidence that not only addressed Dr. Lorensen's examination and other evidence considered by Dr. Reynolds, but also reviewed newly acquired evidence from [plaintiff] and her providers."  Id.  The ALJ also found Dr. Chen's determination to be "more consistent with [plaintiff's] sworn testimony." Id.  The ALJ did not limit plaintiff beyond the limitations Dr. Chen suggested as she found that the record did not "support greater physical limitations" because in "most records since [plaintiff's] amended alleged onset date, she has denied having any pain or fatigue and her clinical physical  exams have been essentially normal."  Id.

### 3. Analysis

Plaintiff argues that "[t]he ALJ failed to incorporate Dr. Chen's opinion on access to bathrooms into the residual functional capacity, despite finding the opinion persuasive." Dkt. No. 13 at 23. Plaintiff also contends that the ALJ erred because she found plaintiff's surgical balder repair to be a non-severe impairment but "did not [otherwise] mention urinary or bladder control issues anywhere in the decision." Id. at 24. The Commissioner argues that the ALJ's decision to adopt Dr. Chen's recommended "medium" work exertion but no "greater physical limitations" is supported by substantial evidence because plaintiff repeatedly denied incontinence and genitourinary problems and her issues were "apparently controllable with undergarments." Dkt. No. 14 at 10. Further, the Commissioner contends that the absence of a bathroom limitation is harmless because "most jobs have ready access to bathrooms." Id.

This Court has affirmed an ALJ's decision where the ALJ incorporated into the plaintiff's RFC a requirement for "normal bathroom breaks" and the plaintiff's "discussions with his own treating physicians and consultative examiners never indicated that his Crohn's disease interfered with his day on a regular and continuing basis." Alford v. Colvin, No. 5:12-CV-977 (NAM/CFH), 2013 WL 6839554, at *13 (N.D.N.Y. Dec. 27, 2013) (emphasis added); see also Margarita S. v. Comm'r of Soc. Sec., No. 6:17-CV-967 (ATB), 2019 WL 266678, at *6 (N.D.N.Y. Jan. 18, 2019) ("Although the ALJ made only cursory mention of plaintiff's interstitial cystitis in his RFC determination . . . [the] plaintiff has not identified any record evidence, besides her brief testimony, that would suggest functional limitations arising from this impairment, such

as an excessive time off-task, that should have been included in the RFC."); Seiler v. Saul, No. 18-CV-01088F, 2020 WL 1283440, at *4 (W.D.N.Y. Mar. 18, 2020) ("[N]othing in the record here indicates that [the p]laintiff would require such ready access to a bathroom or frequent bathroom breaks that [the p]laintiff's residual functional capacity would be eroded to a level where [the p]laintiff would be unable to work.").

The Western District of New York, however, has determined that an ALJ erred where he included in the plaintiff's RFC a requirement for "ready access to toilet facilities," but "failed to make specific findings regarding the frequency and length of anticipated bathroom breaks" and "did not base his conclusions regarding [the p]laintiff's requirements for bathroom access bathroom and the extent to which this erodes the occupational basis for light work . . . on any medical opinion or vocational expert testimony." Lowe v. Colvin, No. 6:15-CV-06077(MAT), 2016 WL 624922, at *6-7 (W.D.N.Y. Feb. 17, 2016). In Lowe, the record indicated that the plaintiff had constant abdominal pain, and had frequent diarrhea, nausea, and vomiting. Id. at *6; but see Packard v. Berryhill, No. 16-CV-00560V(F), 2018 WL 3651330, at *5 (W.D.N.Y. Aug. 1, 2018) (explaining that where the plaintiff "use[d] the bathroom three to four times daily . . . and is occasionally required to dash to the bathroom[,]" the record did not indicate "that [the p]laintiff would require such ready access to a bathroom or frequent bathroom breaks that [the p]laintiff's residual functional capacity would be eroded to a level where [the p]laintiff, as the [p]laintiff in Lowe, would be unable to work."). Moreover, an ALJ's decision has been remanded where it "[wa]s completely devoid of discussion about [the] plaintiff's urinary incontinence[]" but the record included "multiple diagnoses" related to incontinence, the plaintiff was referred to a urologist, and she was "taking medication for

this." <u>Lafler v. Colvin</u>, No. 14-CV-6517, 2016 WL 1247209, at *10 (W.D.N.Y. Mar. 24,

2016).  The court in <u>Lafler</u> explained that "the loss of bladder control is a non-exertional

'impairment under the Social Security Act that must be considered to determine whether

an applicant is disabled.'" <u>Id.</u> (quoting <u>Golembiewski v. Barnhart</u>, 322 F.3d 912, 917

(7th Cir. 2003) ("Evidence that [the plaintiff's] bladder impairment did not interfere with

his work therefore would be a reason for the ALJ to discount the disabling nature of the

problem, but it would not justify ignoring the problem entirely as the ALJ did here.")); <u>see</u>

<u>Rockwood v. Astrue</u>, 614 F. Supp. 2d 252, 279 (N.D.N.Y. 2009) (emphasis added) ("In

formulating the RFC, the ALJ must consider <u>all</u> the relevant evidence on the record,

including physical abilities, mental abilities, symptomatology, such as pain, and <u>other</u>

<u>limitations that could interfere with work activities on a regular and continuing basis</u>.").

Here, plaintiff reported to Dr. Lorensen that she had "problems controlling her

urine and will frequently be unable to make it to the bathroom, so she wears

undergarments[,]" which Drs. Reynolds and Chen restated in their narrative

explanations. T. at 714; 68, 101.  Dr. Chen, therefore, determined that plaintiff "requires

ready access to bathroom facilities due to urinary incontinence." <u>Id.</u> at 101.  In plaintiff's

function report she did not list her incontinence as a relevant medical condition or list it

as a way in which her "illnesses, injuries, or conditions" limit her activities.  <u>Id.</u> at 256.

She explained in the "personal care" section of her report that she "wear[s] disposal

discreet underwear – my bladder is very weak, it is hard to hold my urine." <u>Id.</u> at 258.

During her hearing, the ALJ asked whether plaintiff had "any physical problems that

would affect [her] ability to perform work[,]" and plaintiff responded, "I have concern with

my right knee and with my right foot, but I won't know until I can be able to get in to see

16

a doctor.  As far as my, my knee, my right knee gives out on me and my right foot, it's just a bunion, and it's unbearable."  Id. at 47.  The ALJ also asked plaintiff about her sciatica, arthritis, and liver problems that were "reference[d]" in the record.  Id. at 47-48.  Plaintiff explained that her liver problems cause her to be unable to "drink again[,]" and that she does not have any medication for it "except to try to eat healthy[.]"  Id. at 49.

In addition to plaintiff's statement to Dr. Lorensen, plaintiff explained to her primary care physician that she has "urinary loss of control (esp[ecially] with standing - wearing depends)" and during her inpatient drug rehabilitation treatment, she "ha[d] urinary leakage, brought depends."  T. at 438, 829.  At other points in the record, plaintiff denied incontinence or "[g]enitourinary" symptoms.  See id. at 452, 783, 904, 965, 970, 1158, 1169, 1171.

The ALJ did not include a bathroom-related limitation in the hypothetical questions she posed to the vocational expert ("VE").  See T. at 353-54.  She indicated that the hypothetical plaintiff would require "normal breaks" and asked the VE to "state the employer tolerance for off task behavior[.]"  Id. at 356.  The VE wrote that "[t]he generally accepted time off task is no more than 10% of the work day [sic] in addition to normal breaks or 6 minutes per hour."  Id.  In her decision, the ALJ found that plaintiff's surgical bladder repair was a non-severe impairment.  See id. at 16.  Later in the decision, the ALJ reviewed plaintiff's hearing testimony including her statements concerning her physical health problems and related symptoms and explained that plaintiff "did not allege any disabling physical impairments in her initial disability report . . . . Nor did she describe any specific work-related physical limitations in her function report [] or during her hearing."  Id. at 19.  The ALJ found "Dr. Chen's assessment more

persuasive than the other medical opinions because it supported by a detailed narrative analysis of the evidence" and incorporated Dr. Chen's opined limitations almost verbatim into plaintiff's RFC.  Id. at 20; 19.  However, Dr. Chen noted that plaintiff required "ready access to bathrooms" and the ALJ stated that plaintiff should have "normal breaks[.]"  Id. at 19.

The ALJ reiterated, almost entirety, Dr. Lorensen's findings and the reviewing psychologists' determinations but did not mention plaintiff's report to Dr. Lorensen regarding her incontinence, the psychologists' restatement of that report, Dr. Chen's conclusion that plaintiff required ready access to the bathroom, or the notations in the treatment record regarding incontinence.  See T. at 16-20.  The ALJ stated that she found Dr. Chen's opinion more persuasive than the other medical opinions in part because of his "detailed narrative analysis"—which invariably included his notation regarding access to the bathroom.  Id. at 20; 19.  The ALJ did not explain, however, whether "ready access" to bathrooms was unnecessary, or whether providing plaintiff with "normal breaks" in a workday was sufficient in its place.  Id. at 20; 19; see Benique v. Kijakazi, No. 20-CV-3243 (PAE/OTW), 2021 WL 4894582, at *6 (S.D.N.Y. Sept. 10, 2021), report and recommendation adopted, 2021 WL 4894612 (S.D.N.Y. Sept. 27, 2021) (citation and quotation marks omitted) ("It is not proper for a court to speculate that an ALJ implicitly incorporated limitations identified by a doctor into an RFC assessment; instead, it is incumbent upon the ALJ to provide a detailed rationale for either rejecting the limitations or deeming them accommodated by the limitations stated as part of the RFC assessment.").

It is true that "[t]he ALJ need not adopt opinions in their entirety, but may instead adopt only those portions that she finds to be consistent with the record as a whole." Janet L.K. v. Saul, No. 1:20-CV-0725 (GTS), 2021 WL 2592899, at *4 (N.D.N.Y. June 24, 2021); see also Tyler M. v. Saul, No. 3:19-CV-426 (CFH), 2020 WL 5258344, at *8 (N.D.N.Y. Sept. 3, 2020) ("[T]he RFC formulated by the ALJ need not 'perfectly correspond with any of the opinions of medical sources cited in his decision, [because an ALJ is] entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.'").  Further, it is "[u]ltimately, [] [the] [p]laintiff's burden to prove a more restrictive RFC[.]"  Abate v. Comm'r of Soc. Sec., No. 1:18-CV-0266 (WBC), 2020 WL 4597315, at *5 (W.D.N.Y. Aug. 11, 2020).  However, because incontinence is a non-exertional impairment that must be considered, plaintiff indicated to the consultative examiner that she had problems in this area, and the ALJ did not mention it despite multiple notations in the record, remand is required.  See Alford, 2013 WL 6839554, at *7; Lafler, 2016 WL 1247209, at *10; Heidrich v. Berryhill, 312 F. Supp. 3d 371, 375 (W.D.N.Y. 2018) ("[T]he ALJ's failure to determine whether and to what extent [the] plaintiff's incontinence affects her RFC—for example, whether plaintiff requires breaks more frequently than usual or requires close access to a restroom—is reversible error.").

In turn, the Court cannot confidently conclude that the ALJ's failure to discuss plaintiff's incontinence is harmless error.  To the extent the record does not appear to indicate that plaintiff's incontinence impacts her ability to work, the Court is unable to make this conclusion for itself where the ALJ did not discuss it.  See Bartrum v. Astrue, 32 F. Supp. 3d 320, 331 (N.D.N.Y. 2012) (citation omitted) ("This Court simply cannot,

and will not, re-weigh the medical evidence and/or create post-hoc rationalizations to explain the Commissioner's treatment of evidence when that treatment is not apparent from the Commissioner's decision itself.").  The Commissioner argues that the ALJ's failure to include an "access to bathrooms" limitation is harmless because "most jobs have ready access to bathrooms."  Dkt. No. 14 at 11.  The Commissioner cites to an out of Circuit case in which the ALJ included an "access to bathroom" limitation in the plaintiff's RFC.  Rhonda E. G. v. Saul, No. 8:20-CV-01423 (KES), 2021 WL 2262552, at *8-9 (C.D. Cal. June 3, 2021); see Dkt. No. 14 at 11.  Therefore, the case is distinguishable and not persuasive.  Moreover, the Commissioner's proffered reasons as to why a bathroom limitation is unwarranted were not stated by the ALJ "and this Court is not permitted to accept the Commissioner's post-hoc rationalization in this regard."  Martinbeault v. Astrue, No. 1:07-CV-1297 (DNH), 2009 WL 5030789, at *6 (N.D.N.Y. Dec. 14, 2009).  The Western District of New York has explained that "[a]lthough the RFC does not provide for unscheduled bathroom breaks, the RFC does not prohibit [the p]laintiff from accessing the bathroom during his standard breaks, which would include two 15-minute breaks and one 30-minute break each day."  Bowen v. Comm'r of Soc. Sec., No. 1:19-CV-00420 (EAW), 2020 WL 2839318, at *3, n.2 (W.D.N.Y. June 1, 2020) (affirming the ALJ's decision where the ALJ reviewed the plaintiff's testimony concerning his inability to control his bowel movements and the evidence the record showing no incontinence or dysfunction).  However, the ALJ did not discuss the evidence in the record relating to plaintiff's incontinence or whether "normal breaks" accommodates for the need to have "ready access" to bathrooms, and the ALJ did not ask, nor did the VE explain, whether "ready access" to bathrooms would erode

the availability of "medium" work.  T. at 19, 101, 352-56.[9]  Accordingly, the Court cannot

conclude that the ALJ's lack of discussion concerning plaintiff's incontinence is

harmless error and remand is required on this ground.

### C. Plaintiff's Mental Health RFC

### 1. Medical Opinions Concerning Mental Limitations

### a. Consultative Examiner

Jeanne A. Shapiro, Ph.D., conducted plaintiff's psychological consultative

examination.  See T. at 718-22.  On examination, Dr. Shapiro noted that plaintiff's

"demeanor and responsiveness to questions was cooperative.  Her manner of relating,

social skills, and overall presentation was adequate."  T. at 720.  Plaintiff "was

appropriately dressed.  Her personal hygiene and grooming was good. . . .  Her

expressive and receptive language was adequate.  Her thought processes were

coherent and goal directed with no evidence of delusions, hallucinations, or disordered

thinking."  Id.  Further, Dr. Shapiro indicated that plaintiff's "affect as constricted.  It was

somewhat reduced in intensity compared to [her] thoughts and speech. . . .  During the

examination, [plaintiff] reported feeling irritable; [she] was a little tense, somewhat

hostile and easily annoyed."  Id.  Plaintiff was oriented; her attention, concentration, and

recent and remote memory skills were intact; her intellectual functioning was in the low

average range, and her insight and judgment were poor.  See id. at 720-21.

Dr. Shapiro concluded that plaintiff had (1) no limitations understanding,

remembering, or applying simple directions and instructions, and sustaining an ordinary

---

[9] The three jobs the VE identified as positions that a hypothetical plaintiff could have given plaintiff's RFC do not address the accessibility of bathrooms or allowability for bathroom breaks.  See T. at 353-54; see Laundry Worker II, DICOT 361.685-018; Food-service Worker, Hospital, DICOT 319.677-014; Kitchen Helper, DICOT 318.687-010.

routine and regular attendance at work; (2) mild limitations understanding, remembering, and applying complex instructions, being aware of normal hazards, and taking appropriate precautions; (3) mild to moderate limitations sustaining concentration, performing a task at a consistent pace, maintaining personal hygiene, and wearing appropriate attire; (4) moderate limitations using reasoning and judgment to make work-related decisions; and (5) moderate to marked limitations interacting adequately with supervisors, coworkers, and the public, regulating emotions, controlling behavior, and maintaining well-being. See T. at 721. Dr. Shapiro explained that plaintiff's "[d]ifficulties are caused by psychiatric symptoms and substance abuse problems." Id. Dr. Shapiro stated that "[t]he expected duration of the impairment and time-frame for suggested therapy is more than 2 years. . . . Her prognosis may improve slowly over time with appropriate treatment. . . . [She] appears to be incapable of managing money because of substance abuse." Id. at 722.

**b. State Agency Medical Examiners**

J. Dambrocia, Ph.D., conducted plaintiff's initial psychological disability determination. See T. at 71. Dr. Dambrocia indicated that plaintiff reported "one hospitalization" but records were not received to confirm the date. Id. at 70. Dr. Dambrocia noted that in a 2018 report plaintiff "was not clear on ETOH use, but was using marijuana daily, and was having some serious suicidal thoughts, . . . depression and worried about what others are thinking of her, overwhelmed by life. More recent report of 3/19 report indicates [she] notes to be actively using crack cocaine and marijuana." Id. Dr. Dambrocia reviewed "Helio Health reports" which indicated that plaintiff was being "seen for anxiety and depression with symptoms worsening after

death of grandmother.  [She] reportedly isolates and stops eating when depressed.

Anxiety symptoms include racing thoughts and being hypervigilant." Id. Further,

plaintiff "was noted to have good supports in the community and is the Exec Director of

Exodus House for Women, a ministry.  She expressed inner struggles with no one in the

community knowing about her substance abuse." Id.

Dr. Dambrocia noted that plaintiff's "3/19" mental status examination ("MSE")

"was positive for anxious mood . . ., but MSE was otherwise unremarkable, and noted to

present as stable.  Subsequent 4/19 report indicated [patient health questionnaire

score] dropped from 24 to 12, and GAD & from 20-1." T. at 70.  Moreover, "[t]he

5/20/19 report indicated [plaintiff] reported some contin[ue]d stressors from school and

children, and indicated she was running a facility.  Report indicates started heroin IV this

year[] and [history] of snorting.  She reports [history] of Alcohol Abuse, but not recently,

but continued use of crack and marijuana." Id.  Plaintiff "reported plans to self-admit to"

a drug rehabilitation program and her "MSE was positive for sad mood, but MSE was

otherwise unremarkable." Id.  Dr. Dambrocia explained that plaintiff was "subsequently

admitted" to a drug rehabilitation program from "6/11/19-7/9/19, and discharge indicates

she was able to find what brings her joy, and report[] indicated she found purpose

again, addressing trauma and working on core issues.  Goals noted were achieved. . . ."

T. at 70-71.  Dr. Dambrocia also recounted Dr. Shapiro's consultative examination

findings. See id. at 71.

Dr. Dambrocia concluded that "[o]verall, [plaintiff's] allegations are considered

partially consistent.  While there is some support for psychiatric difficulties, [she]

appears to have improved with treatment, and retained adequate cognitive functioning

with adequate ranges of [activities of daily living]."  T. at 71.  Dr. Dambrocia also noted

that plaintiff performed her activities of daily living "independently[]" and a "5/19 report

indicated she has been running a facility called 'Ext this house' for women with

Domestic Abuse, homelessness, or substance abuse."  Id.  Dr. Dambrocia determined

that plaintiff was moderately limited in her ability to perform activities within a schedule,

maintain regular attendance, be punctual within customary tolerances, complete a

normal work day or work week without interruptions from her psychologically-based

symptoms, interact appropriately with the general public, and respond appropriately to

changes in a work setting.  See id. at 69-70.  Dr. Dambrocia summarized that plaintiff "is

able to understand and complete simple and complex work.  [She] can maintain

adequate attention and concentration to complete work like procedure and sustain

routine.  [She] is able to relate and respond to other appropriately.  [She] would benefit

from tasks that do not involve a high degree of stress."  Id. at 71.

        S. Hennessey, Ph.D., conducted plaintiff's psychological disability determination

on reconsideration.  See T. at 104.  Dr. Hennessey fully reiterated Dr. Dambrocia's

narrative explanation.  See id. at 103-04.  Dr. Hennessey noted that "[a]ll evidence has

been reviewed both at the initial level and new evidence at reconsideration.  [Plaintiff]

reports in her submitted ADLs [that] 'nothing has changed.'"  Id. at 104.  Plaintiff

reported that she continued to see a counselor at Helio Health and "[a]n updated

request for records was sent, and a nurse practitioner note dated 08/23/19 noted a

diagnosis of schizoaffective disorder with good prognostic features[.]"  Id.  Dr.

Hennessey determined that plaintiff was moderately limited in her ability to understand

and remember detailed instructions, perform activities within a schedule, maintain

regular attendance, be punctual within customary tolerances, work in coordination with

others, complete a normal work day or work week without interruption from

psychologically-based symptoms, interact appropriately with the general public, and

respond appropriately to changes in the work setting.  See id. at 102-103.  In

summation, Dr. Hennessey explained that

> [o]verall, despite some limitations, [plaintiff] retains the mental capacity to
> understand, remember simple and some multistep instructions, she is able
> to carry out work procedures with an adequate level of persistence and
> pace.  [She] may have some problems with intense and prolonged social
> interactions but is capable of relating to others in superficial work
> interaction.  She would have difficulty handling high stress or demand
> work situations, but can adapt to changes in a routine work setting and
> can use appropriate judgment to make work-related decisions.

Id. at 104.

### c. Treating Therapist

Bruce Green, MCP-H, was plaintiff's "primary counselor" at Helio Health.  T. at

1184; see generally T. at 1010-1146, 1184-1252.  Mr. Green submitted a medical

source statement indicating that he saw plaintiff "on average, twice monthly, for 1 year."

Id. at 1181.  Mr. Green noted that plaintiff was diagnosed with depression, generalized

anxiety disorder, cocaine use disorder, unspecified psychosis, schizoaffective disorder,

and cannabis use.  See id.  He indicated that plaintiff "will need continued, long-term

counselling and medication management to manage her mental health symptoms."  Id.

Mr. Green indicated that plaintiff was (1) "[s]eriously limited, but not precluded" from

remembering work-like procedures, carrying out very short and simple instructions,

asking simple questions, requesting assistance, getting along with co-workers and

peers, responding appropriately to changes in the work setting, and adhering to basic

standard of neatness and cleanliness; (2) "[u]nable to meet competitive standards" in

understanding and remembering short and simple instructions, maintaining attention for a two-hour segment, maintaining regular attendance and punctuality, sustaining an ordinary routine, working in coordination with or proximity to others, performing at a consistent pace, dealing with normal work stress, being aware of normal hazards, interacting appropriately with the general public, maintaining socially appropriate behavior, and traveling in unfamiliar places; and (3) without the "useful ability to function" in making simple work-related decisions, completing a normal work day or week without interruptions from psychologically-based symptoms, accepting instructions and criticism from supervisors, and using public transportation.  Id. at 1182-83.  Mr. Green further explained that plaintiff's "pain levels are greatly increased when she experiences high levels of anxiety."  Id. at 1183.  He also concluded that plaintiff would miss more than four days of work per month.  See id.

### 2. ALJ's Discussion of Plaintiff's Mental Limitations

The ALJ reviewed plaintiff's testimony and function reports and recounted that plaintiff "reported having problems paying attention, concentrating, organizing her thoughts, following instructions, completing tasks, interacting with other people, remembering things, and handling stress or schedule changes[.]"  T. at 17.  Plaintiff indicated "that she experiences anxiety, depression, 'burst[s] of anger,' difficulty sleeping, and 'no energy'" and had a "long history of chemical addiction[.]"  Id.  The ALJ explained that "[a]ccording to [plaintiff], she 'hate[s] social interactions' and avoids social events, preferring to stay home, where she feels 'safe[.]' . . .  She also reportedly avoids phone calls and 'procrastinate[s] to the point of feeling overwhelmed with doing simple daily task[s] like eating or bathing[.]'"  Id.

The ALJ noted that plaintiff "lives in a house with her four nieces and nephews, whom she has raised since their infancy . . . .  The children were 17, 16, 15, and 13-years-old as of the hearing date . . . and one of them reportedly has a history of 'behavioral issues[.]'"  T. at 17.  Further, the ALJ noted that plaintiff "appears to be close with her mother" who helps plaintiff with shopping and "some other tasks[,]" but plaintiff "prepares simple meals, does some laundry, attends various appointments and AA meetings, manages her money, can drive when necessary, and spends time watching television, coloring, and 'playing on her phone[.]'"  Id.  The ALJ also indicated that plaintiff "testified she has remained sober since completing inpatient treatment in July 2019."  Id.

The ALJ recited Dr. Shapiro's examination findings and conclusions and explained that "[a]lthough Dr. Shapiro thought [plaintiff] had 'moderate-marked' limitations for interacting with others, regulating emotions, controlling behavior, and maintaining well-being [], two state agency psychologists determined from their independent reviews of the evidence that [plaintiff] had no more than 'moderate' limitations for interacting with others and adapting or managing herself[.]"  T. at 18.  The ALJ also explained that the reviewing psychologists agreed with Dr. Shapiro that plaintiff "had 'moderate' limitations for concentrating, persisting, or maintaining pace, and only 'mild' limitations for understanding, remembering, or applying information."  Id.  Accordingly, the ALJ determined that plaintiff had "mild difficulties in understanding, remembering, or applying information; moderate difficulties in interacting with others; moderate difficulties in concentrating, persisting, or maintaining pace; and moderate difficulties in adapting or managing oneself."  Id.  In relation to these findings, the ALJ

indicated that she expressly considered Listings "12.02 (neurocognitive disorders),

12.03 (schizophrenia spectrum and other psychotic disorders), 12.04 (depressive,

bipolar and related disorders), and 12.06 (anxiety and obsessive-compulsive

disorders)[.]" Id. at 16.

In determining plaintiff's RFC, the ALJ again recounted Dr. Shapiro's findings and

Dr. Dambrocia's and Dr. Hennessey's determinations. See T. at 20-21. The ALJ found

the assessments "persuasive to the extent they are consistent with one another." Id. at

21. The ALJ explained that "[t]ogether, these sources have identified significant

limitations in the areas social interaction; concentrating, persisting, or maintaining pace;

and adapting or self-management. However, I do not find the record to support more

than 'moderate' limitations in any of these areas." Id. at 21. The ALJ noted that

although during plaintiff's psychiatric evaluation she felt irritable, appeared tense,

hostile, and annoyed, and had a constricted affect and poor insight and judgment, she

made good eye contact, had normal posture and motor behavior, had adequate

expressive and receptive language skills, was cooperative, had an adequate manner of

relating and social skills, and her thought processes were coherent and goal oriented

with no delusions, hallucinations or disordered thinking. See id. at 21, 720-21. The ALJ

also explained that plaintiff referred herself for inpatient "treatment at Conifer Park,

where she successfully completed a 28-day inpatient rehabilitation program[]" in June

2019. Id. at 21; see id. 813-44. The ALJ recounted Dr. Dambrocia's and Dr.

Hennessey's identical notations that after plaintiff's inpatient treatment she "'was able to

find what brings her joy' and felt she had 'found her purpose again[.]' . . . She also

achieved all of her treatment goals and, as mentioned, has been able to maintain sobriety since her discharge[.]" Id. at 21 (quoting T. at 85, 104); see T. at 813.

The ALJ explained that following plaintiff's inpatient treatment, mental examinations indicated "some positive findings, such as poor impulse control, hallucinations, delusions, and occasional tangential and homicidal thoughts . . . . However, they have also often documented a normal mood and affect, linear and logical thought processes, intact memory, and/or 'fair' or better insight and judgment[.]" T. at 21-22. The ALJ "again note[d]" that plaintiff "live[ed] in a house with her four teenage nieces and nephews, whom she has raised since their infancy[,]" and reiterated plaintiff's activities of daily living. Id. at 22. The ALJ then reviewed Mr. Green's medical source statement and explained that she did not "find this assessment persuasive because it is inconsistent with the other medical opinions of record." Id. The ALJ stated that the "assessment is [] primarily a check-box form, containing little to no explanation and few references to actual clinical findings to support the proposed limitations[]"; " the level of limitation proposed by Mr. Green [was] inconsistent with and unsupported by [plaintiff's] aforementioned activities and mental status exams"; and the "assessment, including her ability to maintain attendance, is inconsistent with [plaintiff's] demonstrated ability to rear four children, maintain her sobriety, and regularly attend her multiple meetings, therapy sessions, and other scheduled appointments." Id.

### 3. Analysis

Plaintiff argues that the ALJ erred by (1) discounting Mr. Green's opinion because it was a check-box form; (2) failing to discuss the supportability of the opinion with Mr. Green's treatment notes; (3) relying too heavily on plaintiff's activities of daily

living; and (4) failing to consider the degree to which plaintiff's treatment impacted her ability to attend work.  See Dkt. No. 13 at 14-20.  The Commissioner asserts that the ALJ's decision is supported by substantial evidence because Mr. Green did not provide a supporting explanation for his opinion, and the ALJ discussed plaintiff's treatment notes and her need to attend various counseling sessions or appointments.  See Dkt. No. 14 at 6-9.

"[T]he Second Circuit has recently clarified that an opinion by a treating provider should not be discounted solely because it is provided on a check-box form."  Kimberly W. v. Kijakazi, No. 6:20-CV-925 (DJS), 2022 WL 561665, at *4 (N.D.N.Y. Feb. 24, 2022) (citing Colgan v. Kijakazi, 22 F.4th 353, 360-61 (2d Cir. 2022)).  Rather, "the nature of an ALJ's inquiry in disability factfinding turns on the substance of the medical opinion at issue—not its form—and ultimately whether there is reasonable evidence in the record that supports the conclusions drawn by the medical expert[.]"  Colgan, 22 F.4th at 361.  Therefore, had the ALJ stopped there, discounting Mr. Green's opinion solely because it was a check-box form, remand would likely be required.  Cf. Kimberly W., 2022 WL 561665, at *4.  However, the ALJ continued, explaining that "the level of limitation proposed by Mr. Green [was] inconsistent with and unsupported by [plaintiff's] [] activities and mental status exams."  T. at 22.  In a previous paragraph of her decision, the ALJ noted the positive and negative findings from plaintiff's "mental status exams" and cited to multiple records from Syracuse Gastroenterological Associations, P.C., plaintiff's primary care physician Dr. Cohen, and Elijah Stevens, N.P., one of the other providers at Helio Health.  See T. at 969, 971, 95, 981, 985, 1036-37, 1043-44, 1048-49, 1056-57, 1064-65, 1072-73, 1081-82, 1090-91.  Despite there being ample

records from Mr. Green, submitted by Helio Health, wherein Mr. Green discusses the
counseling sessions he had with plaintiff, the ALJ did not reference them.  See id. at 20-
22.

As plaintiff states, the regulations require the ALJ to determine a medical
opinion's "supportability"—the degree to which the medical opinion is reinforced through
that provider's "objective medical evidence and supporting explanations[.]"  20 C.F.R.
§ 404.1520c(c)(1); see Dkt. No. 13 at 15-16.  The ALJ noted that Mr. Green did not
provide supporting explanations for his opinions on the medical source statement.  See
T. at 22.  The ALJ did not then compare the medical source statement with Mr. Green's
counseling session notes.  See id.; see Jesse R. v. Comm'r of Soc. Sec., No. 3:20-CV-
1220 (CFH), 2022 WL 813918, at *7 (N.D.N.Y. Mar. 17, 2022) ("The ALJ did not explain
whether the substance of [the treating psychologist's] opinion was supported by his
treatment notes or psychiatric evaluations. . . .  This omission amounts to legal error
where the ALJ did not sufficiently "explain how [h]e considered the supportability" of
[the] opinion with his objective medical evidence and the Court cannot otherwise glean
the ALJ's rationale in finding the opinion unsupported.").  On its face, this constitutes
legal error because § 404.1520c(b)(2) requires the ALJ to discuss the objective medical
evidence presented by a medical source.

However, in this instance, the ALJ's lack of discussion of Mr. Green's counseling
notes is harmless error.  See, e.g., Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010)
(explaining that where there is "no reasonable likelihood that [the ALJ's] consideration of
[a] . . . doctor's [] report would have changed the ALJ's determination . . . remand for
consideration of the improperly excluded report is unnecessary[ ]").  The counseling

notes reveal nearly identical conclusions to what the mental status examinations revealed—that plaintiff had good and bad days, providing mixed results—which the ALJ explicitly discussed.  See T. at 21-22.  For example, Mr. Green's counseling notes indicated that plaintiff was "overwhelmed by her thoughts and [wa]s in some way 'paralyzed,'" she spent "most of her time when not at Helio Health or in AA meetings, in her room, often asleep[,]" her "speech was tangential and thoughts were scattered[,]" and "she had thoughts that she just wanted to die, was tearful, anxious, and it was very difficult for her to go out of her house . . . to get to her appointment."  T. at 1099, 1093, 1104, 1112.  However, generally during plaintiff's counseling sessions, she was alert, oriented, had a "full affect and mood congruent with affect[,]" and was mentally present.  See id. at 1040, 1046, 1051, 1054, 1059, 1061, 1069, 1077, 1084, 1088, 1093, 1102, 1104, 1106, 1109, 1115, 1117.  There were also sessions were plaintiff was "generally upbeat[,]" "in a very good mood[,]" at the end of a sessions "she felt very good" and "looked forward to coming to therapy because she could talk to someone who was objective about her situation and issues[,]" and she was feeling "very good" about continue counseling sessions.  Id. at 1054, 1059, 1107, 1117.

Although it would have been prudent for the ALJ to discuss Mr. Green's counseling notes when determining the persuasiveness she afforded his opinion, his notes do not add any information which the ALJ had not already mentioned through the gastroenterologist's, primary care provider's, and other Helio Health practitioner's records.  See T. at 21-22.  The ALJ also discussed Dr. Shapiro's findings that plaintiff had a constricted affect and poor insight and judgment.  See id. at 21.  As the ALJ discussed the same issues that Mr. Green identified, not mentioning Mr. Green's

32

specific counseling sessions amounts to harmless error.  See Greek v. Colvin, 802 F.3d 370, 376 (2d Cir. 2015) (emphasis added) (distinguishing Zabala, 595 F.3d 402, and noting that where an ALJ does not address "essentially duplicative" evidence it is harmless error but where "the only other evidence" in the record is lay witness and non-treating physician evidence, ignoring a treating physician's opinion is not harmless).

Mr. Green concluded that plaintiff would be unable to meet competitive standards in maintaining regular attendance and being punctual.  See T. at 1182.  He also concluded that plaintiff would miss more than four days of work per month because of her "impairments or treatment[.]"  Id. at 1183.  The ALJ explained "that Mr. Green's assessment, including [plaintiff's] ability to maintain attendance, is inconsistent with [plaintiff's] demonstrated ability to rear four children, maintain her sobriety, and regularly attend her multiple meetings, therapy sessions, and other scheduled appointments."  Id. at 22.  Plaintiff argues that "[t]he ALJ failed to acknowledge that MHC-P Green's opinion was based both on symptoms from [p]laintiff's impairment and from attending treatment to manage her impairments."  Dkt. No. 13 at 19.  Mr. Green did not explain the reasons for his "x" marks on his medical source statement.  See T. at 1182-83.  Therefore, to the extent plaintiff asserts that Mr. Green believed plaintiff would miss work because of her need to attend treatment, there is nothing in the record to support that conclusion.  It is just as likely that Mr. Green believed plaintiff would miss four days of work because of her mental health symptoms.  It is for this reason that providing "supportive explanations" is imperative and a threshold for determining the persuasiveness of a medical opinion.  20 C.F.R. § 404.1520c(c)(1).

"The RFC assessment must be based on all of the relevant evidence in the case record, such as . . . [t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)[.]"  Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).  Therefore, an ALJ is required to consider "absenteeism due to treatment."  Gomez v. Saul, No. 19-CV-9278 (PMH/JCM), 2020 WL 8620075, at *32 (S.D.N.Y. Dec. 23, 2020), report and recommendation adopted, 2021 WL 706744 (S.D.N.Y. Feb. 22, 2021) (citing Bellinger v. Comm'r of Soc. Sec., No. 3:17-cv-1692 (MPS), 2018 WL 6716092, at *3 (D. Conn. Dec. 21, 2018) ("Absenteeism due to the frequency of treatment is a relevant factor so long as the treatment is medically necessary and concerns the conditions on which the disability claim is founded.")); see also Paula L. v. Comm'r of Soc. Sec., No. 20-CV-1224 (DB), 2021 WL 3549438, at *8 (W.D.N.Y. Aug. 11, 2021) (explaining that the plaintiff's potential absenteeism of time off-task due to panic attacks "stands in stark contrast to an individual who may require extensive medication treatments for several hours a day, necessitating a need to incorporate absences into the RFC determination.").

Plaintiff contends that her "treatment was medically necessary, as shown by sources recommended therapy and/or hospitalization and continuing to prescribe medication."  Dkt. No. 13 at 19-20.  However, there is nothing in the record that mandates plaintiff's attendance at AA meetings.  See Scott G. v. Comm'r of Soc. Sec., No. 1:19-CV-1482 (DB), 2021 WL 958452, at *4 (W.D.N.Y. Mar. 15, 2021) (emphasis added) ("An individual should not be found disabled simply because of frequent medical

visits—only if those visits are medically necessary to treat the noted impairments and interfere with the ability to work."). Mr. Green stated in his medical source statement that plaintiff "will need continued, long-term counselling and medication management to manage her mental health symptoms." T. at 1181. The Court does not wish to make light of the progress plaintiff has made with her mental health and substance abuse issues, however, despite plaintiff's need for continued counseling, there is no indication that plaintiff could not continue to pursue her meetings and therapy alongside a job. Also, the ALJ discounted Mr. Green's opinion, including his conclusion related to plaintiff's ability to maintain attendance, not only because of plaintiff's attendance at "multiple meetings, therapy sessions, and other scheduled appointments[,]" but because it was "inconsistent with the other medical opinions of record[,]" there was "little to no explanation" to support the limitations, and it was inconsistent with plaintiff's other activities of daily living, and mental status examinations. T. at 22; see Sarah C. v. Comm'r of Soc. Sec., No. 5:19-CV-1431 (FJS), 2021 WL 1175072, at *18 (N.D.N.Y. Mar. 29, 2021) (distinguishing Fountaine v. Comm'r of Soc. Sec., No. 18-CV-6033 (JWF), 2019 WL 1428522, *3-4 (W.D.N.Y. Mar. 29, 2019), and explaining that the "[p]laintiff's attendance at medical appointments was just one of several reasons on which the ALJ relied to afford partial weight to [the consultative examiner's] opinion.").

The ALJ expressly considered plaintiff's meetings, therapy sessions, and appointments, and determined that they indicated that she could maintain attendance at work. See T. at 22; contra Bellinger, 2018 WL 6716092, at *3 ("Without an explanation of how the ALJ considered the infusions (or any indication that he recognized the need to consider them at all), I cannot determine whether he properly applied the law or

whether his conclusions were supported by substantial evidence."). Plaintiff testified that she has a counseling session with Mr. Green once a week, goes to group therapy twice a week, sees Dr. Stevens, her psychiatrist, "at least every two weeks[,]" and she attends AA meetings "seven days a week and its at 5:15 to 6:15." T. at 45-46, 55. Although this could indicate that it would be difficult for plaintiff to manage a full-time work schedule, the ALJ concluded otherwise. See id. at 22; cf. Lucas v. Comm'r of Soc. Sec., No. 19-CV-195SR, 2020 WL 5748098, at *3 (W.D.N.Y. Sept. 25, 2020) ("[W]hile [the] plaintiff consistently received chiropractic treatments multiple times per week and received weekly massage during a portion of the relevant time period, the medical record documents that these treatments lasted 15 minutes and there was no evidence that such appointments could not be scheduled to accommodate a full-time work schedule").

Of note, "attending medical or counseling appointments even on a regular basis is not tantamount to being able to perform work-related activities on a full-time or equivalent basis in a normal workplace." Miller v. Colvin, 122 F. Supp. 3d 23, 30 (W.D.N.Y. 2015). "However, it is relevant to show that [p]laintiff is capable of maintaining a schedule, which, in turn, supports the ALJ's finding that she is not disabled." Tracie P. v. Comm'r of Soc. Sec., No. 3:19-CV-837 (FJS), 2020 WL 2309082, at *8, n.5 (N.D.N.Y. May 8, 2020). Plaintiff has not "present[ed] any medical opinion, or other objective evidence, demonstrating that his treatment schedule was so overwhelming that he could not attend to both a full-time work schedule and his treatment." Christian J. v. Comm'r of Soc. Sec., No. 6:18-CV-1004 (ATB), 2019 WL

6840130, at *8 (N.D.N.Y. Dec. 16, 2019).[10]  As such, the Court finds no error in the ALJ's discussion of plaintiff's treatment schedule.

Plaintiff also asserts that the ALJ's decision is not supported by substantial evidence where she improperly relied on plaintiff's activities of daily living.  See Dkt. No. 13 at 16-18.  There is nothing inherently wrong with an ALJ considering a plaintiff's activities of daily living.  To be sure, the regulations encourage ALJ's to consider them.  See 20 C.F.R. § 404.1529(c)(3)(i) ("Factors relevant to [] symptoms, such as pain, which [and ALJ] will consider include . . . [the plaintiff's] daily activities[.]").  The question then becomes whether the ALJ considered those activities absent consideration of other evidence in the record such as treatment records, medical source statements, or contradictory testimony.  See Perozzi v. Berryhill, 287 F. Supp. 3d 471, 492 (S.D.N.Y. 2018) ("An ALJ has discretion to resolve conflicts in the record, including with reference to a claimant's reported activities of daily living.") (collecting cases rejecting the assertion that a plaintiff's activities of daily living cannot be used "as evidence that a medical opinion is inconsistent with the record").  Here, the ALJ considered plaintiff's activities of daily living in conjunction with the rest of the record including the various medical opinions, plaintiff's mental health treatment notes, and her testimony.  See T. at

---

[10] The Commissioner identifies cases from outside of the Second Circuit which have affirmed an ALJ's decision where, despite the plaintiff's need to attend appointments, there was no indication that he or she could not simultaneously maintain employment.  See Dkt. No. 14 at 9; Pryor v. Comm'r of Soc. Sec., No. 14-13325, 2015 WL 12683977, at *7 (E.D. Mich. Aug. 21, 2015), report and recommendation adopted, 2015 WL 6735336 (E.D. Mich. Nov. 4, 2015) (explaining that the plaintiff "has failed to set forth any facts or medical opinions which demonstrate that he requires physical therapy on a rigid schedule that would conflict with his ability to work.  [The plaintiff] has not established any reason to think that he is unable to attend physical therapy sessions after work, on the weekends, during lunch, or on some other schedule."); Rood v. Colvin, No. 12-2595 (SAC), 2014 WL 172131, at *4 (D. Kan. Jan. 15, 2014) (finding no error where "the ALJ found 'that the claimant lacks a commitment to return to work and that attending group therapy two to three times a week does not preclude employment since the claimant has shown no evidence that this cannot be accomplished at times which would not conflict with a work schedule.'").

17-22; see also Bruce C. v. Kijakazi, No. 3:20-CV-782 (DJS), 2021 WL 5112077, at *4

(N.D.N.Y. Nov. 3, 2021) (quoting Alford, 2013 WL 6839554, at *14) ("The ALJ certainly

considered [the p]laintiff's daily activities and assessed the extent to which they were

consistent with an individual's ability to do sedentary work. . . .  To the extent that it was

error not to more specifically delineate the precise role [the p]laintiff's daily activities

played among the other relevant factors in determining his RFC, 'such arguments at

best result in harmless error.'").

Plaintiff further takes issue with the ALJ's consideration of "[p]laintiff's ability to

raise children . . . ."  Dkt. No. 13 at 16.  Plaintiff contends that "the ALJ failed to note that

by the time [p]laintiff's impairments became disabling (February 8, 2019), the children

were teenagers who did not require the same kind of attention as younger children."  Id.

at 17.  The ALJ explicitly stated that "[t]he children were 17, 16, 15, and 13-years-old as

of the hearing date"—April 17, 2020.  T. at 17, 33.  Plaintiff also states that the ALJ

ignored the fact that plaintiff received help from others to care for the children, but the

ALJ again expressly stated that plaintiff's mother helps plaintiff with various tasks.  See

id. at 17.

Next, plaintiff contends that the ALJ erred in finding that plaintiff could

occasionally interact with coworkers and supervisors but only incidentally interact with

the public, claiming that "the ALJ failed to explain the reason for the difference[.]"  Dkt.

No. 13 at 17.  The ALJ reiterated Dr. Shapiro's conclusion that plaintiff had "'moderate-

marked['] limitations for interacting adequately with supervisors, coworkers, and the

public[.]"  T. at 21.  She also noted that Dr. Dambrocia determined that plaintiff could

relate and respond appropriately to others, and Dr. Hennessey "thought" that "while

[plaintiff] might 'have some problems with intense and prolonged social interactions,' she 'is capable of relating to others in a superficial work interaction.'" Id. (quoting T. at 104).  The ALJ acknowledged that "[t]ogether, these sources have identified significant limitations in the areas social interaction[.]"  Id.  In determining that plaintiff had no more than a moderate limitation, the ALJ reviewed every aspect of Dr. Shapiro's examination including plaintiff's subjective reports.  See id.

Moreover, Dr. Dambrocia determined that plaintiff was not  significantly limited in her ability to work in coordination or proximity with others,  accept instruction and respond appropriately to supervisors, or get along with coworkers and peers, but was moderately limited in her ability to interact appropriately with the general public.  See T. at 69.  Dr. Hennessey similarly determined that plaintiff was not significantly limited in accepting instruction and responding appropriately to supervisors or getting along with coworkers but was moderately limited in her ability to interact with the public and work in coordination with others.  See id. at 102-103.  The ALJ did not explicitly reference this distinction in her recitation of the state agency psychologists' determinations.  See id. at 21-22.  However, the ALJ expressly relied on the determinations in determining plaintiff's RFC and they provide substantial support for the ALJ's distinction in plaintiff's ability to interact with the public versus supervisors and coworkers.  See Call v. Comm'r of Soc. Sec., No. 1:16-CV-1003 (WBC), 2017 WL 2126809, at *5 (N.D.N.Y. May 16, 2017) ("Overall, substantial evidence in the record supported the ALJ's determination that despite difficulties maintaining appropriate social interactions, [the p]laintiff could have 'frequent' but not 'constant' contact with coworkers, supervisors and the public.").

The ALJ does not need to cite every piece of evidence used to support her decision. <u>See</u> Cichocki, 729 F.3d at 178, n.3.  Although she did not restate every sentence from the state agency consultants' determinations or cite every treatment note, she left no stone unturned as the record related to plaintiff's mental health. <u>See</u> <u>Call</u>, 2017 WL 2126809, at *3 (citing <u>Monroe v. Comm'r of Soc. Sec.</u>, 676 F. App'x 5, 8-9 (2d Cir. 2017) (summary order)) ("The Second Circuit has held that an RFC determination need not align with a specific medical opinion and may be based on the record as a whole.").  The ALJ acknowledged the various medical opinions and the degree of their opined limitations, the positive and negative psychological findings in plaintiff's treatment notes, her subjective complaints and testimony, and her activities of daily living. <u>See</u> T. at 17-22; <u>see also</u> <u>Sierra M. B. v. Saul</u>, No. 1:20-CV-0127 (GTS), 2020 WL 7316121, at *6 (N.D.N.Y. Dec. 11, 2020) ("[T]here is no merit to [the p]laintiff's assertion that the ALJ ignored evidence of greater limitations; rather, the ALJ found that such evidence was inconsistent with the picture of functioning created by the evidence in the record as a whole.  Such weighing of the evidence was entirely proper.").  As the ALJ considered all of the evidence to determine plaintiff's mental health RFC and that determination was supported by substantial evidence, remand is not warranted on this ground. <u>See</u> <u>Tammy Lynn B. v. Comm'r of Soc. Sec.</u>, 382 F. Supp. 3d 184, 195 (N.D.N.Y. 2019) ("[The p]laintiff's disagreement with the ultimate factual determinations that the ALJ drew from this record evidence is not a basis for remand.").

## VI. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby:

**ORDERED**, that plaintiff's Motion for Judgment on the Pleadings, Dkt. No. 13, is **GRANTED**; and it is further

**ORDERED**, that defendant's Cross-Motion for Judgment on the Pleadings, Dkt. No. 14, is **DENIED**, and the matter is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), to the Commissioner for further proceedings consistent with this Memorandum-Decision & Order.

**IT IS SO ORDERED.**

Dated: April 7, 2022
        Albany, New York

Christian F. Hummel
U.S. Magistrate Judge